# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### ORANGEBURG DIVISION

| | | |
|---|---|---|
| LINDA MCCUTCHEON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  5:04-2467-RBH-BM |
| | ) | |
| v. | ) | |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| a foreign corporation, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| WINFIELD MCCUTCHEON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  5:04-2468-RBH-BM |
| | ) | |
| v. | ) | |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| a foreign corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The above captioned cases have been filed by the Plaintiffs against a common Defendant, Wal-Mart Stores, Inc.  By order filed January 27, 2005, these cases were ordered consolidated after a finding by the Court that they dealt with similar claims and that it would serve the interests of judicial economy to have these matters heard at the same time.  Both of these cases were originally filed in the South Carolina Court of Common Pleas, and were removed to this Court by the Defendant.

1



The Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on June 15, 2005. After being granted an extension of time, Plaintiffs filed a memorandum in opposition on July 25, 2005 (case No. 2467) and July 28, 2005 (case No. 2468). Defendant filed a reply memorandum on August 1, 2005. Defendant's motion is now before the Court for disposition.[1]

### Background and Evidence[2]

Plaintiff Winfield McCutcheon (McCutcheon) is an African-American who commenced his employment with the Defendant on August 6, 2002 as a stocker. Plaintiff Linda McCutcheon (Mrs. McCutcheon), a Caucasian who is married to McCutcheon, also commenced her employment with the Defendant on August 6, 2002 as a hourly associate in the Defendant's shoe section. Both Plaintiffs were issued handbooks which set forth the policies and procedures for employment with the Defendant. About seven (7) months into their employment, McCutcheon was promoted to a supervisory maintenance position in the Orangeburg Super Center Wal-Mart in Orangeburg, South Carolina. Mrs. McCutcheon was transferred to the maintenance department at the Defendant's Orangeburg store. W. McCutcheon Deposition, pp. 41-43; L. McCutcheon Deposition, p. 17.

McCutcheon testified that the Orangeburg store had a group of African-American

---

[1]Case No. 2468 was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. Case No. 2467 was referred as well following its consolidation with case No. 2468. The Defendant has filed a motion for summary judgment for both cases. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[2]The facts and evidence are considered and discussed hereinabove in the light most favorable to the Plaintiffs, the parties opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).



employees on the third shift who referred to themselves as the "posse". McCutcheon testified that these individuals frequently met together and believed the African-American employees should "stick together". McCutcheon testified that these employees looked at him "different, you know, because I'm married to a white woman." W. McCutcheon Deposition, pp. 77-82. McCutcheon also testified that on one occasion his supervisor (also an African-American) assigned him to clean one half of the store while he (the supervisor) cleaned the other half. McCutcheon testified that he cleaned his half and then went home when he finished his shift, but that upon arriving home he received a phone call from the store manager (a Caucasian) concerning the store not being cleaned properly. W. McCutcheon Deposition, pp. 49-51. However, when McCutcheon arrived at the store it turned out that it was his supervisor's side that was not cleaned properly. McCutcheon testified that when he told management the other supervisor was responsible for that area, he was told by another African-American (Lewis Preacher) that "brothers stick together" and that he [McCutcheon] should have "just take[n] the blame." W. McCutcheon Deposition, pp. 48-51.

In addition to this comment, McCutcheon testified that he would receive negative comments from African-American co-workers concerning his inter-racial marriage, and because he had a confederate flag on his truck. W. McCutcheon Deposition, pp. 52, 63.[3] McCutcheon further testified that one time during a meeting with overnight associates an African-American support manager, Larry Hampton, remarked to another African-American manager, Hyacynthe Koua, that the African-American associates would rather work for a white person than a black person. W. McCutcheon Deposition, p. 88. McCutcheon testified that Hampton would also make other "racial"

---

[3]McCutcheon states in his brief that he had a Confederate flag sticker on his truck because one of his ancestors served in the Confederate army, although the deposition page cite referenced for this statement does not actually mention this reason. W. McCutcheon Deposition, p. 63.



type statements, such as that the reason he could work overtime was because of his skin color. W. McCutcheon Deposition, p. 74. McCutcheon testified that he complained to store management about these comments, and was told that the matter would be investigated. W. McCutcheon Deposition, pp. 76-80, 92. As part of management's investigation, McCutcheon provided a written statement. W. McCutcheon Deposition, pp. 102-103. Following this investigation, Hampton received a "disciplinary coaching" from store management about his comments. Crosland Deposition, pp. 37-39; Coleman Deposition, p. 24; see also Crosland Deposition Exhibits 12-14.

McCutcheon filed a complaint of discrimination with the South Carolina Human Affairs Commission on December 16, 2003, complaining that he had been subjected to racial remarks in meetings by black employees, and that the Defendant had not taken appropriate disciplinary action against these other employees. See W. McCutcheon Deposition, Exhibit 2. McCutcheon testified that after he filed this administrative charge, the District Manager (McCutcheon could not remember his name) called him and told him that he "should have kept the matter in-house." W. McCutcheon Deposition, pp. 98-100. McCutcheon was later "coach[ed]" by management because Mrs. McCutcheon was allegedly passing out human affairs forms to co-workers. W. McCutcheon Deposition, pp. 98-101.

The evidence also reflects that McCutcheon was injured on the job when he slipped while working on or about June 7, 2003. W. McCutcheon Deposition, pp. 103-104. This injury required surgery and caused McCutcheon to miss time from work. McCutcheon testified that at one point (on or about February 9, 2004), an assistant manager at the Orangeburg store, William Ulch (Caucasian), told him that he would need to obtain a doctor's excuse for his absences. W. McCutcheon Deposition, p. 109. McCutcheon then obtained a doctor's note for his absences. W.

4



McCutcheon Deposition, pp. 111-112; see also Deposition Exhibit 5.  However,  McCutcheon also

complained to store co-manager Randy Coleman (African-American) that Ulch had told him that

the reason he needed to get the doctor's note was to "cover [his] ass". W. McCutcheon Deposition,

pp. 110-112.

Finally, McCutcheon testified that on the evening of April 8, 2004 he observed a

minor  female child of a customer who had wet herself.  W. McCutcheon Deposition, p. 113.

McCutcheon testified that he told the girl's mother to go talk to management and that they would

probably give her daughter some dry clothes to put on.     W. McCutcheon Deposition, p. 118.

McCutcheon testified that he was subsequently berated by Koua (African-American), Tracey

Weaver (African-American), and Ulch about having informed the girl's mother that they could have

some dry clothes. W. McCutcheon Deposition, pp. 118-119, 121-124.   The conversation became

heated, with voices being raised.  Id.  See also Crosland Deposition, p. 42; Weaver Deposition, p.

14.

McCutcheon was subsequently counseled by store co-manager Jim Crosland

(Caucasian) and was given a "decision-making day" coaching because of  McCutcheon's allegedly

disrespectful conduct towards Ulch during the confrontation.  W. McCutcheon Deposition, pp. 125-

126; Crosland Deposition, pp. 43, 46; see also Crosland Deposition Exhibits 16-17, 20-22, 26-27.

McCutcheon was required to take a day off with pay, and to write a statement for management

addressing his conduct setting forth a plan of action to ensure that such behavior would not reoccur.

 W. McCutcheon Deposition, p. 127; Crosland Deposition, pp. 26, 43 and Crosland Deposition

Exhibits 16 & 17.  However, when he returned to work the next day, he instead handed in a

statement complaining about the management of the Orangeburg store. W. McCutcheon Deposition,

5



pp. 128-129 and Exhibit 6; Crosland Deposition, p. 45.  McCutcheon was advised that this response was not acceptable, and after he refused to write a new statement, he was terminated by Coleman. W. McCutcheon Deposition, pp. 129-130 and Exhibit 8; Crosland Deposition, pp. 45-46 and Crosland Deposition Exhibits 18 & 28; Coleman Deposition, pp. 21-22; L. McCutcheon Deposition, 18.  Mrs. McCutcheon attended this final meeting, and upon McCutcheon's termination, she also resigned her employment.  L McCutcheon Deposition, pp. 18-19.

     Plaintiffs then filed two separate lawsuits against the Defendant.  In his Complaint, McCutcheon sets forth six causes of action, as follows: wrongful termination in violation of S.C.Code § 41-1-80, et. al. [first cause of action], race discrimination 42 U.S.C. § 1981 [second cause of action], retaliation 42 U.S.C. § 1981 et. seq. [third cause of action], disparate discipline race discrimination in violation of 42 U.S.C. 1981a [fourth cause of action], wrongful termination in violation of employment contract [fifth cause of action], and breach of contract [sixth cause of action].  In her case, Mrs. McCutcheon sets forth three causes of action, as follows: wrongful termination in violation of employment contract [first cause of action], breach of contract [second cause of action], and constructive discharge [third cause of action].   Defendant has moved for summary judgment as to all claims in both cases.

**Discussion**

     Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the pleadings is appropriate.  Once the moving party makes this showing, however, the

6

opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.

## I.

### (Plaintiff Winfield McCutcheon's Claim for Wrongful Termination in Violation of S.C.Code § 41-1-80, et. seq.)

In his first cause of action, McCutcheon alleges that the Defendant violated S.C.Code Ann. § 41-1-80 by terminating him for filing a workers compensation claim. Section 41-1-80 makes it unlawful for an employer to discharge or demote an employee for instituting a proceeding under South Carolina's workers compensation law. Defendant argues that McCutcheon has failed to present any evidence to show a violation of this statute, and the undersigned is constrained to agree.

Both sides agree that under South Carolina law the court must use the "determinative factor test" to evaluate McCutcheon's claim. See Porter v. U.S. Alumowelda Co., Inc., 125 F.3d 243, 247-248 (4th Cir. 1997); Wallace v. Milliken & Co., 406 S.E.2d 358, 360 (S.C. 1991). This test requires the employee to establish that he would not have been discharged "but for" the filing of the workers compensation claim. Id.

> The burden of persuasion never shifts and the employee bears the burden of persuasion that the reason given for termination was pretextual....The employee may succeed in this, either directly by persuading the court that the discharge was significantly motivated by retaliation for [his] exercise of statutory rights, or indirectly by showing that the employer's proffered explanation [for the adverse action taken] is unworthy of credence.

Wallace, 406 S.E.2d at 360 (quoting Buckner v. General Motors Corp., 760 P.2d 803, 807 (Okla. 1998)); see also Porter, 125 F.3d at 248.

McCutcheon argues that the Defendant's claimed reason for firing him was pretextual is shown by the proximity in time between his filing a workers compensation claim and his termination, citing to Lattie v. SHS Enterprises, Inc., 389 S.E.2d 300 (S.C.Ct. App. 1990). In Lattie,

7



the South Carolina Court of Appeals held that the defendant employer was not entitled to summary judgment on plaintiff's retaliatory discharge claim where the evidence showed that the employer had discharged the plaintiff only sixteen (16) days after he instituted workers compensation proceedings, and could produce no documentation reflecting the work standards that the employer claimed plaintiff violated.  The court held that the proximity in time between plaintiff's instituting the workers compensation proceedings and his firing, when coupled with evidence of his satisfactory work performance, was sufficient to avoid summary judgment. Id.  These facts do not, however, parallel the facts in the case at bar.

Here, McCutcheon's termination did not occur until almost a year after he had filed for workers compensation benefits. Crosland Deposition Exhibit 11.  Further, as correctly noted by the Defendant, McCutcheon himself admitted that the Defendant accommodated his restrictions following his injury and never treated his workers compensation situation unfavorably.  W. McCutcheon Deposition, pp. 106-107.  Even when McCutcheon was advised by Ulch that he needed to obtain a doctor's note to "cover his ass" when he was unable to come to work in February 2004 because his foot was hurting him, it is undisputed that McCutcheon obtained the doctor's excuse and never suffered any adverse action for not coming to work on that date. W. McCutcheon Deposition, pp. 111-112, & Deposition Exhibit 5.

Finally, the Defendant has presented evidence, undisputed by McCutcheon, to show that on April 8, 2004 McCutcheon engaged in a heated conversation with Ulch in the presence of customers, and that McCutcheon continued his comments towards Ulch even after Ulch walked away.  When McCutcheon was given a decision-making day coaching during which he was supposed to write a statement for management addressing the conduct in question and setting forth

8



a plan of action to ensure the behavior did not reoccur, McCutcheon instead wrote a statement which continued to complain about the management at the Orangeburg store and thereafter refused to write a new statement when requested by management. See generally, W. McCutcheon Deposition, pp. 121-129 and Exhibit 6; Crosland Deposition, pp. 42-46 and Crosland Deposition Exhibits 16-18, 20-22 & 26-27; Weaver Deposition, pp. 12-14; Coleman Deposition, pp. 21-22. Whether or not the Defendant was justified for terminating McCutcheon based on this behavior, there is no dispute in the evidence that this incident occurred and that McCutcheon failed to comply with instructions given to him by management. Further, there is no evidence linking this incident to McCutcheon having filed a workers compensation claim almost a year earlier.

In sum, the evidence shows that McCutcheon was not terminated on or around the time that he filed his workers compensation claim, that the Defendant had in fact worked with and accommodated him with regard to his injuries, and that his termination did not occur until almost a year after he had filed for workers compensation and following an incident in which he engaged in a heated argument with management and then failed to comply with their instructions. See also Crosland Deposition, Exhibit 5 [Employee Handbook], [setting forth "coaching" policy and including language stating that rude or abusive/inappropriate conduct toward fellow employees may result in termination]. Even viewing the facts in the light most favorable to McCutcheon, the evidence presented is not sufficient to create a genuine issue of material fact as to whether his discharge was significantly motivated by retaliation for his having filed a workers compensation claim, or that the Defendant's proffered reason for his termination is unworthy of credence. *Cf.* Porter, 125 F.3d at 247-248. Therefore, this claim should be dismissed.

9



## II.

### (Race Discrimination Claims)

In McCutcheon's second cause of action, he alleges that he was discriminated against on the basis of his race when he was discharged by the Defendant. McCutcheon alleges in his third cause of action that his discharge also constituted unlawful retaliation against him for having engaged in protected conduct (complaining about discriminatory treatment). Finally, McCutcheon alleges in his fourth cause of action that he was subject to unlawful discipline by the Defendant because of his race. McCutcheon brings these claims under 42 U.S.C. § 1981.[4]

**a) Disparate treatment claim.** McCutcheon's race discrimination termination claim is for disparate treatment, and is based on his assertion that he was subjected to racial discrimination when he was terminated.[5] In order to pursue a disparate treatment claim for race discrimination,

---

[4] While McCutcheon also makes reference to 42 U.S.C. § 2000e, et. seq. [Title VII of the Civil Rights Act of 1964] in his Complaint, see Complaint, ¶¶ 60, 96 and 98; both parties argue McCutcheon's discrimination claims only under § 1981. The standards applicable to lawsuits under § 1981 and Title VII are basically the same, so the same caselaw is used to evaluate a claim under either statute. See Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002) ["In analyzing a claim...under section 1981, we apply the same standards as in a similar Title VII claim."]; Long v. First Union Corp. of Virginia, 894 F.Supp. 933, 945 (E.D.Va. 1995); Kim v. Nash Finch Co., 123 F.3d 1046, 1063 (8th Cir. 1997).

[5] McCutcheon only briefed discrimination claims for hostile work environment and retaliatory discharge. However, the Defendant has also briefed a separate discriminatory discharge claim, and a plain reading of McCutcheon's second cause of action indicates that he has asserted a discriminatory discharge claim. Whether he was discharged because of his race is a separate and distinct cause of action from whether McCutcheon was discharged due to unlawful retaliation against him for having engaged in protected conduct, or was subjected to a hostile work environment. Patrick v. Chertoff, No. 01-152, 2005 WL 1827876 at *4 (N.D.Tex. July 27, 2005) ["Discrimination and retaliation are separate claims, and must be treated accordingly."]. Therefore, although not briefed by McCutcheon, the undersigned has set forth a discriminatory discharge analysis hereinabove in an effort to ensure that every possible claim asserted in this lawsuit has been addressed.



10

McCutcheon must present evidence of intentional discrimination, either by direct evidence or by the structured procedures set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[6] McCutcheon has not offered any direct evidence of race discrimination in his termination,[7] and Defendant argues that McCutcheon has failed to present sufficient circumstantial evidence to create a genuine issue of fact as to whether he was discharged because of his race under the <u>McDonnell Douglas</u> proof scheme to survive summary judgment.

   The United States Supreme Court articulated a three-part formula for analyzing discrimination cases in <u>McDonnell Douglas</u>. <u>First</u>, McCutcheon must establish a prima facie case of discrimination. If a prima facie case is established, a rebuttable presumption is created that the Defendant unlawfully discriminated against him. <u>Second</u>, once this presumption has been established, the burden of production shifts to the Defendant to show a legitimate, non-discriminatory reason for its actions. <u>Third</u>, if the Defendant shows a legitimate, non-discriminatory reason for its actions, the burden is then on McCutcheon to come forward with evidence that the

_____

 [6]While <u>McDonnell Douglas</u> is a Title VII case, the Court has previously noted that the standards applicable to lawsuits under § 1981 and Title VII or basically the same. <u>Ross</u>, 293 F.3d at 1050 ["in analyzing a claim...under § 1981, we apply the same standards as in a similar Title VII claim"]. The main difference between Title VII claims and claims brought under § 1981 is that individual liability is possible under § 1981. <u>Dalton v. Jefferson Smurfit Corp.</u>, 979 F.Supp. 1187, 1201-1203 (S.D.Ohio 1997); <i>cf.</i> <u>Lissau v. Southern Foods Serv., Inc.</u>, 159 F.3d 177, 180-181 (4th Cir. 1998). However, no individual liability is asserted in this case. <u>See</u> <u>also</u> <u>Gairola v. Virginia Dep't of General Servs.</u>, 753 F.2d 1281, 1285 (4th Cir. 1985); <u>Abasiekong v. Shelby</u>, 744 F.2d 1055, 1058 (4th Cir. 1984).

 [7]Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions. <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 56 F.3d 542, 548-549 (4th Cir. 1995), <u>rev'd on other grounds</u>, 517 U.S. 308 (1996); <u>Black's Law Dictionary</u>, 460 (6th Ed. 1990) (citing <u>State v. McClure</u>, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974); <u>see</u> <u>Williams v. General Motors Corp</u>, 656 F.2d 120, 130 (5th Cir. 1981), <u>cert. denied</u>, 455 U.S. 943 (1982).



Defendant's asserted reason for its action is a mere pretext for its true discriminatory motives, and that the actions of the Defendant were really based on McCutcheon's race.  McDonnell Douglas Corp., 411 U.S. at 802-805; Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-256 (1981); Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 234-235 (4th Cir. 1991). Despite these shifting burdens of production, however, McCutcheon retains the ultimate burden of persuasion on the issue of discrimination throughout.  Texas Dep't of Community Affairs, 450 U.S. at 252-253; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

In order to meet the first prong of the McDonnell Douglas formula and establish a prima facie case of race discrimination, McCutcheon must show  (1) that he is a member of a protected class; (2) that he was performing his job satisfactorily; (3) that he was subjected to an adverse employment action; and  (4) that other employees who were not members of his  protected class were treated more favorably, or there is some other evidence giving rise to an inference of unlawful discrimination. See generally, Austen v. HCA Health Services of Virginia, Inc., No. 00-2359, 2001 WL 242203 at **1 (4th Cir. Mar. 12, 2001);  Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995), cert. denied, 516 U.S. 870 (1995).  See also Gilbert v. Penn-Wheeling Closure Corp., 917 F.Supp. 1119 (N.D.W.Va. 1996).  It is undisputed that McCutcheon is a member of a protected class (African American), and the evidence before this Court is sufficient to establish for purposes of summary judgment that McCutcheon had been a satisfactory employee with the Defendant up until the time of his discharge. See generally, W. McCutcheon Deposition, pp. 70-71. It is also undisputed that McCutcheon suffered an adverse employment action when he was terminated.  However, Defendant argues that McCutcheon has failed to produce any evidence to

12



give rise to an inference of unlawful discrimination in his termination,[8] and has therefore failed to establish all of the necessary prongs of his prima facie case.

After careful consideration of the evidence presented, the undersigned agrees with the Defendant that there is insufficient evidence to give rise to an inference of unlawful discrimination in McCutcheon's termination to survive summary judgment, and that to the extent McCutcheon has intended to assert a disparate treatment discharge claim (again, McCutcheon has set forth no argument with respect to this claim), it should be dismissed. Specifically, the evidence before the Court shows that McCutcheon always received good employee evaluations, that the Defendant worked with and accommodated him following his injury, and that there was no reference to McCutcheon's race, his marriage, or any other racial connotations with regard to the incident surrounding his discharge. While a claim for discrimination based on one's relationship with a person of another race is a claim cognizable under § 1981; see Fiedler v. Maramusco Christian School, 631 F.2d 1144, 1149 (4th Cir. 1980); Parr v. Woodman, 791 F.2d 888, 890 (11th Cir. 1986); Swick v. UPS, No. 02-3254, 2005 WL 1793723, *6 (D.N.J. July 26, 2005); and McCutcheon does allege that some members of the so-called "posse " or Larry Hampton (all African-Americans) may have had a discriminatory attitude against him because of his inter-racial marriage, he has presented no evidence to show that any of these individuals played any role in his termination, or that Coleman, Crosland, or anyone else who *was* involved in his termination had any racial animus towards him. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) ["unsubstantiated allegations" are insufficient to defeat summary judgment]; cf. Cook v. CSK

---

[8]No evidence has been presented to show that a similarly situated white employee received more favorable treatment than did McCutcheon, nor has McCutcheon made this alternative argument.



Transp. Corp., 988 F.2d 507, 513 (4th Cir. 1993) ["[U]nsupported allegations do not establish a prima facie case of race discrimination...."].

Further, although Ulch (one of the individuals McCutcheon had the confrontation with) is white (the other two employees involved in the confrontation with McCutcheon being African-American), it is significant to note that both Plaintiffs testified McCutcheon was terminated by Randy Coleman, a fellow African-American. W. McCutcheon Deposition, pp. 129-130; Coleman Deposition, pp. 21-22; L. McCutcheon Deposition, p. 18.[9]  While McCutcheon has argued other motivations (specifically, retaliation) for why the decision may have been made to terminate his employment, he has offered no rationale as to why Coleman would have terminated him because he is an African-American, when Coleman is himself an African-American. *Cf.* Dungee v. Northeast Foods, Inc., 940 F.Supp. 682 n. 3 (D.N.J. 1996) [that decisionmaker is member of plaintiff's protected class "weakens any possible inference of discrimination"];  Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1471 (11th Cir. 1991) ["[I]t is difficult for a plaintiff to establish discrimination when the allegedly discriminatory decision-makers are within the same protected class as the plaintiff."]; *cf.* United States v. Crosby, 59 F.3d 1133, 1135 n. 4 (11th Cir. 1995) ["While we acknowledge that a...violation may occur even where a supervisor or decision-maker is of the same race as the alleged victim....we note that the district court found that there was no evidence that [the decision-maker] held members of his own race to a higher standard of conduct than members of another race."].

Finally, even if McCutcheon had presented sufficient evidence to establish a prima facie case, he has still failed to present any evidence of pretext in the Defendant's decisionmaking.

---

[9]Crosland's signature is also on the termination notice. Crosland Deposition, p. 45.

14



See Causey v. Balog, 162 F.3d 795, 801-802 (4th Cir. 1998) [affirming summary judgment where employee failed to show that his employer's alleged mistreatment was based on his race]. It is undisputed in the evidence that Plaintiff did in fact have an argument with several other employees, and in particular Ulch, and that he thereafter did not satisfactorily complete a counseling document when instructed to do so. McCutcheon's own conclusory opinion and belief that he was the victim of discrimination when he was terminated, no matter how heartfelt, is simply not sufficient to establish a case of discrimination or to survive summary judgment. Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) [A party opposing summary judgment "cannot create a general issue of fact through mere speculation or by the building of one inference upon another."]; Causey, 162 F.3d at 802 [conclusory statements without evidentiary support insufficient to create genuine issue of fact]; Glover v. Lockheed Corp., 772 F.Supp. 898, 901 (D.S.C. 1991) [summary judgment granted where Plaintiff failed to produce sufficient evidence to create a genuine issue of material fact as to whether he was discriminated against]; Gairola v. Virginia Dep't of General Services, 753 F.2d 1281, 1288, n. 4 (4th Cir. 1985) [a case should be dismissed "...when the only evidence in support of the plaintiff's...case is based on unfounded conjecture...that [his] disfavorable treatment was the result of discrimination...."].

   Therefore, any disparate treatment race discrimination claim being asserted in this case should be dismissed.

   **b) Retaliation claim.** In his third cause of action, McCutcheon alleges that he engaged in protected activity when he submitted both oral and written complaints of racial discrimination in the workplace, and that the Defendant then terminated him for engaging in this protected conduct.

15



Retaliation cases are subject to the same requirements of proof as are applicable to disparate treatment claims. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985) overruled on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); see also Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).  "The employee is initially required to establish a prima facie case of retaliation by a preponderance of the evidence.  Such a prima facie case consists of three elements:  (1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action."  Id.; Munday v. Waste Management of North America, Inc., 126 F.3d 239, 242 (4th Cir. 1997); Bryant v. Aiken Regional Medical Centers, Inc., 333 F.3d 536, 543 (4th Cir. 2003).  Once a prima facie case has been presented, the Defendant employer has the burden of producing a legitimate, non-discriminatory reason for its actions.  If the employer can produce a legitimate, non-discriminatory reason for its actions, the employee must demonstrate that the Defendant's proffered reason is pretextural. Id.

With respect to his prima facie case, McCutcheon engaged in protected activity when he complained to store manager Jim Crosland about race based comments being made by other African-American employees, and when he filed an administrative charge of discrimination with SCHAC.  It is also undisputed that the Defendant took an adverse employment action against McCutcheon by terminating him.  Defendant argues, however, that McCutcheon has failed to submit sufficient evidence to establish a causal connection between these two events, and therefore

16



has failed to establish all of the necessary prongs of his prima facie case.[10]  The undersigned does not agree.

McCutcheon testified that he complained to store co-manager Randy Coleman about Larry Hampton's purportedly offensive comments, as well as to Jim Crosland about negative comments from other black associates.  W. McCutcheon Deposition, pp. 74-80.  Randy Coleman was also the management official to whom Plaintiff complained about Ulch's "cover your ass" comment.  W. McCutcheon Deposition, pp. 110-112.  Coleman, Crosland, and Ulch were all involved in the later incident and/or resulting investigation which led to McCutcheon's termination.  W. McCutcheon Deposition, pp. 118-119, 121-126. Ulch was the one with whom McCutcheon got into an argument, Crosland was the one who counseled McCutcheon and gave him a "decision-making day" for his purported improper behavior,  and Coleman is the one who Plaintiffs testified terminated him.  The evidence also shows that after McCutcheon filed his administrative charge of discrimination with SCHAC, he was called at home by the Defendant's district manager and informed that he should have kept the matter "in-house" rather than going to SCHAC.  W. McCutcheon Deposition, pp. 98-100.  McCutcheon testified that Coleman then asked him to "keep quiet" and coached him for allegedly improperly soliciting co-workers, during which he was also told by Coleman that he [McCutcheon] was creating "a hostile environment" at the store by pursuing these claims.  Id, pp. 100-101.[11]

---

[10]Defendant also argues in its brief that McCutcheon cannot meet his prima facie burden because he has failed to present any evidence that a Caucasian employee who engaged in similar conduct to his own was disciplined more favorably than he was.  That is not, however, an element of a retaliation prima facie case.

[11]The coaching was for McCutcheon and/or his wife allegedly handing out forms to employees for them to get in touch with SCHAC. McCutcheon Deposition, p. 101.



In sum, considered in the light most favorable to the Plaintiff, the evidence shows that the individuals to whom McCutcheon complained were the same individuals who later terminated his employment, and in particular that Coleman as well as other management officials were unhappy with McCutcheon having filed an administrative claim with SCHAC. The undersigned finds for purposes of Defendant's motion for summary judgment that this evidence is sufficient to satisfy the less demanding burden of making a prima facie case of causality. See <u>Texas Dep't of Community Affairs</u>, 450 U.S. at 253 [the burden of establishing a prima facie case is not onerous].

The establishment by a plaintiff of a prima facie case of retaliation shifts to the Defendant the burden of setting forth a legitimate, non-discriminatory reason for its actions. <u>Lovelace v. Sherwin Williams Co.</u>, 681 F.2d 230, 239 (4th Cir. 1982). Here, the Defendant has presented evidence to show that McCutcheon was insubordinate to his superiors and then failed to comply with management's directives concerning his inappropriate conduct. This evidence is sufficient for the Defendant to meet its burden of production to show a legitimate, non-discriminatory reason for its decision to terminate McCutcheon's employment, and the Court must therefore turn to consideration of the final prong of the <u>McDonnell Douglas</u> analysis. <u>EEOC v. Clay Printing Co.</u>, 955 F.2d 936, 941 (4th Cir. 1991) [The defendant's burden is only of one of production, not of persuasion].

Where a Defendant employer rebuts the employee's inference of discrimination by demonstrating a legitimate, non-discriminatory reason for the employment decision, the Plaintiff/employee can still prevail by demonstrating by a preponderance of the evidence that the employer's proffered reason is a mere pretext for discriminatory conduct. To make this demonstration, Plaintiff must show that "but for" his employer's retaliatory intent, he would not

18



have suffered the adverse employment action. <u>EEOC</u>, 955 F.2d at 941; <u>Conkwright v. Westinghouse</u>, 933 F.2d 231, 234 (4th Cir. 1991). "Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole . . . must be sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by [retaliatory animus].'" <u>LeBlanc v. Great American Insurance Co.</u>, 6 F.3d 836, 843 (1st Cir. 1993)(citing <u>Goldman v. First Nat'l Bank</u>, 985 F.2d 1113, 1117 (1st Cir. 1993)(quoting <u>Connell v. Bank of Boston</u>, 924 F.2d 1169, 1172, n. 3 (1st Cir. 1991), <u>cert. denied</u>, 111 S.Ct. 2828 (1991)); <u>see</u> <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 141-143 (2000).

After careful review of the evidence and testimony presented, the undersigned finds that McCutcheon has presented sufficient evidence, when considered in the light most favorable to him, to raise a genuine issue of fact with respect to pretext. Considered in the light most favorable to McCutcheon, the evidence shows that he had worked for the Defendant for several years, including having received a promotion, and that he had a good employment record. The evidence further shows that following his transfer to the Defendant's Orangeburg store, he encountered employees (fellow African-Americans) who would make disparaging comments about his inter-racial marriage and/or treated him disparately because of his marriage, and also made disparaging comments about African-Americans and how they worked in relation to whites. The evidence shows that McCutcheon complained to his superiors, Randy Coleman and Jim Crosland, about these comments and also filed an administrative charge of discrimination concerning this conduct with SCHAC. McCutcheon also complained to Coleman about a white superior (Ulch) using improper language in a conversation with him. After he engaged in this conduct, the Defendant's district manager informed him that he should have kept the matter "in-house" rather than going to SCHAC

19



with his complaints, while Coleman told him to "keep quiet" and then coached him for allegedly

improperly soliciting other employees to fill out SCHAC complaint forms, with Coleman even

telling him that he was creating a hostile environment at the store by pursuing this course of conduct.

When McCutcheon subsequently got into a shouting match with Ulch over an incident at the store,

he was counseled and required to take a paid leave day by Crosland, and after McCutcheon did not

respond to his counseling to Coleman's satisfaction, Coleman fired him.

    Considered in the light most favorable to McCutcheon, this evidence is sufficient to

avoid summary judgment on his retaliation claim.  While there certainly is evidence in the file to

support the Defendant's claim that it had a valid reason for the employment decision taken, the

undersigned does not find that "[n]o  reasonable trier of fact could conclude" that McCutcheon's

termination was the result of a retaliatory animus. <u>Spratley v. Hampton City Fire Dept.</u>, 933 F.Supp.

535, 542 (E.D.Va. 1996), <u>aff'd</u>, 125 F.3d 848 (4th Cir. 1997);  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 255 (1986) [at summary judgment, the "evidence of the non-movant is to be believed, and

all justifiable inferences are to be drawn in his favor"]; <u>see</u> <u>LeBlanc,</u> 6 F.3d at 843 ["[I]ndirect

evidence of discriminatory motive may do [as long as it is] sufficient for a reasonable factfinder to

infer that the employer's decision...was motivated by [retaliatory animus]"];  *cf.* <u>Hunt-Golliday v.</u>

<u>Metropolitan Water Reclamation District of Greater Chicago</u>, 104 F.3d 1004, 1014 (7th Cir. 1997)

[suspicious timing constitutes circumstantial evidence to support a claim of discrimination].

Therefore, Defendant's motion for summary judgment with respect to McCutcheon's retaliation

claim should be denied.

    **c) Hostile Work Environment Claim.**  McCutcheon's fourth cause of action,

liberally construed, could be read as restating his discriminatory discharge claim, or, when read in

20



conjunction with his second cause of action, in which he alleges that he was "systematically

discriminated against", could be deemed to be a hostile work environment claim. In any event, since

both McCutcheon and the Defendant have briefed a § 1981 hostile work environment claim, the

undersigned has discussed the merits of this claim hereinbelow.

          To establish a claim for hostile work environment under § 1981, McCutcheon must

present evidence sufficient to create a genuine issue of fact as to whether he was subjected to

racially offensive conduct in a work related setting which was sufficiently severe or pervasive to

alter his condition of employment and to create an abusive working environment. To establish

liability, the cited conduct must also be imputable on some factual basis to his employer. See

Ocheltree v. Scollon Productions, Inc., 308 F.3d 351, 356 (4th Cir. 2002), rehearing en banc, 335

F.3d 325 (4th Cir. 2003), cert. denied, 124 S.Ct. 1406 (2004); Spicer v. Commonwealth of

Virginia Dep't of Corrections, 66 F.3d 705, 710 (4th Cir. 1995); Brown v. Perry, 184 F.3d 388,

393 (4th Cir. 1999); Shield v. Federal Exp. Corp., No. 03-2103, 2005 WL 102990 at **3 (4th

Cir. Jan. 19, 2005) (citing Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-184 (4th Cir.

2001)); Tucker v. Merck & Co., Inc., No. 04-3023, 2005 WL 1176565, at **5 (3d Cir. May 19,

2005).

          The conduct or comments cited by McCutcheon in his deposition testimony[12] fail

to meet this standard. First, some of this testimony refers to incidents which either do not overtly

reflect a racial component, or do not reflect that anyone said or did anything overtly racist to or

---

[12]McCutcheon offers no specific argument based on the facts or evidence with regard to his
hostile work environment claim in his brief. Rather, he simply outlines the applicable caselaw
dealing with hostile work environment claims, but does not apply that law to the facts in this case.
See McCutcheon's Brief, pp. 15-16.



about him.  Ulch's comment about McCutcheon needing a doctor's excuse, while in poor taste, was not racial in nature, and it is hard to discern how the group of employees who referred to themselves as the "posse" and who liked to meet together transforms itself into racially offensive conduct against McCutcheon.  See generally, Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994), cert. denied, 516 U.S. 826 (1995) ["General harassment if not racial...is not actionable"]; Norris v. City of Anderson, 125 F.Supp.2d 759, 769 (D.S.C. 2000) ["since plaintiff's allegation contains no racial animus, it cannot be used to support his hostile work environment claim"]; Hawkins v. Pepsico, Inc., 203 F.3d 274,281 (4th Cir. 2000) [affirming the grant of summary judgment to the employer where the employee could not "show that... [the] problems were racial in nature"].  With respect to some of the other incidents cited to by McCutcheon, little evidence can be found to support a hostile work environment claim.  Regarding the incident where he received negative comments from an African-American co-worker because he had a confederate flag on his truck, McCutcheon testified that after he explained to this co-worker why the sticker was on his truck, the two became good friends and there were no further problems between the two of them.  W. McCutcheon Deposition, pp. 61-63.  With respect to Larry Hampton's comments, McCutcheon conceded that no Caucasian employees ever told him that they felt any animosity because of those comments, and that no racial comments were ever directed at McCutcheon because of Hampton's statements.  Indeed, McCutcheon himself testified that Hampton's comments "didn't mean nothing to me."  See generally, W. McCutcheon Deposition, pp. 74-77, 88, 92, 95.[13]  Tucker, 205 WL 1176565, at **5 [no retaliation claim where

---

[13]McCutcheon also testified that management told Hampton not to make those comments, and that following McCutcheon's complaint an investigation was conducted into Hampton's conduct.  W. McCutcheon Deposition, pp. 76-77, 92, 102-103.  Following this investigation, Hampton received a disciplinary coaching from management for his comments.  Crosland Deposition, pp. 37-39 and Crosland Deposition Exhibits 12-14; Coleman Deposition, p. 24.



individual(s) at issue never "said or did anything overtly racist to or about [plaintiff]"].

The primary evidence on which a hostile work environment claim might be based is McCutcheon's testimony that some of his fellow African-American employees disapproved of his inter-racial marriage and about the purported "racial tensions" these feeling engendered. However, McCutcheon's testimony about this issue is of a general and conclusory nature, lacking any specifics, and is not in and of itself sufficient to maintain a hostile work environment claim. See W. McCutcheon Deposition, pp. 52, 73-74, 78. See Causey, 162 F.3d at 802 [conclusory statements, without specific evidentiary support, do not support a claim for discrimination]; see also Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 754 (4th Cir. 1996) ["Title VII was not designed to create a federal remedy for all offensive language and conduct in the work place."]; Hartsell v. Duplex Products, 123 F.3d 766, 773 (4th Cir. 1997). In any event, Defendant correctly notes that McCutcheon testified that this issue had no affect on his ability to perform his work. W. McCutcheon Deposition, pp. 74-77. Hence, these general and conclusory allegations are not sufficient to allow McCutcheon to continue with this claim. Hopkins, 77 F.3d at 754; Smith v. Northeastern Illinois University, 388 F.3d 559, 566-567 (7th Cir. 2005) [mere utterances that engender offensive feelings do not provide an automatic basis to find that an actionable hostile work environment exists]; Cram v. Lamson & Sessions, 49 F.3d 466, 474 (8th Cir. 1995) [sporadic or casual comments are unlikely to support a hostile environment claim]; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ["Rule 56(c) mandates the entry of summary judgment... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."]. McCutcheon's hostile work environment claim should therefore be dismissed.

23



## III.

### (Contract Claims)

Both Winfield McCutcheon and Linda McCutcheon assert causes of action in their Complaints for wrongful termination in violation of their employment contract with the Defendant, and breach of contract.[14]  In order for either Plaintiff to successfully pursue these claims, it is necessary that they had an employment contract with the Defendant.  Defendant argues that it had no employment contract with the Plaintiffs, and that these contract causes of action are therefore without merit and should be dismissed.

It is undisputed that South Carolina is an employment at-will state.  <u>Angus v. Burroughs & Chapin Co.</u>, 596 S.E.2d 67, 70 (S.C.Ct.App. 2004); <u>Conner v. City of Forest Acres</u>, 560 S.E.2d 606 (S.C. 2002).  When an employee is an employee at-will, either party has the right to terminate the employee relationship at any time, for any reason or no reason at all, without incurring liability.  <u>Horton v. Darby Elec. Co., Inc.</u>, 599 S.E.2d 456, 460 (S.C. 2004); <u>Dodgens v. Kent Manufacturing Co.</u>, 955 F.Supp. 560, 566 (D.S.C. 1997); <u>Ludwig v. This Minute of Carolina, Inc.</u>, 337 S.E.2d 213, 214-215 (S.C. 1985); <u>Gause v. Doe</u>, 451 S.E.2d 408, 409 (S.C.Ct.App. 1994); <u>Toth v. Square D Co.</u>, 377 S.E.2d 584, 587 (S.C. 1989) [Gregory, C.J. dissenting]. This at-will status can be altered by the creation of a "contract" between the employee and employer, or if an employer issues policies that alter the at-will employment status of the relationship. <u>Hessenthaler v. Tri-County Sister Help, Inc.</u>, 616 S.E. 2d 694, 697 (S.C. 2005); <u>Small v. Springs Industries, Inc.</u>, 357 S.E.2d 452, 455 (S.C. 1987). However, to alter the at-will

---

[14]Winfield McCutcheon's fifth and sixth causes of action; Linda McCutcheon's first and second causes of action.



relationship between the parties, the cited provisions or policies must be drafted in sufficiently mandatory terms to give rise to a reasonable expectation on the part of the employee of continued employment.  Further, to then establish a breach of contract, the employee must show that the employer breached the pertinent provisions or policies at issue. Id.

Plaintiffs do not argue that they had a traditional, formal contract of employment with the Defendant.  Rather, they argue that their at-will status was altered by the mandatory language contained in the Defendant's handbook regarding harassment, retaliation, coaching and employment, and that the Defendant's conduct in this case violated that mandatory language.  The handbook language at issue is as follows:

> Wal-Mart is fully committed to complying with applicable equal employment opportunity laws.
>
> It is the policy of Wal-Mart to provide recruitment, hiring, training, promotion and other conditions of employment without regard to race, color, age, gender, religion, disability, national origin, or veteran status.
>
> Wal-Mart expects its Associates to treat their colleagues and subordinates with respect and dignity and to fully support Wal-Mart's objectives of providing equal opportunity employment and maintaining a workplace free of harassment of any kind.
>
> Our commitment to equal opportunity for all Associates is reinforced by policy and by actions.  We do not tolerate discrimination of any kind.  Not only is discrimination against our beliefs, it's against the law.

Crosland Deposition Exhibit 1 (Handbook, p. 6).

> Our Open Door Policy says that if you have an idea or a problem, you should go to your Supervisor to talk about it without fear of retaliation. Faster resolution may occur when the Associate goes through the immediate Supervisor first. However, if the Associate feels the Supervisor is the source of the problem, or if the problem has not been addressed satisfactorily, the Associate may go to any level of management in the Company.  Remember, while the Open Door promises that you will be heard, it cannot promise that your opinion will always prevail.  Any



suppression of, or retaliation for using the Open Door Policy by a Supervisory Associate may result in disciplinary action, up to and including termination.

Crosland Deposition, Exhibit 1, (Handbook, p. 7).

People generally want to perform well and be successful. Our Coaching for improvement process is designed to inform an Associate when they are not meeting the requirements and expectations for their position. If an Associate's performance or conduct falls below expectations of their position, then the Associate is informed of the problem and encouraged to take responsibility for their actions. This process will include developing a plan of action for improving performance to the required level, or changing conduct.

There are, however, certain actions of misconduct that may result in immediate termination. These actions include, but are not limited, to the following examples: Fraud, Theft…Rude or abusive conduct toward a customer or Associate,…Serious Harassment/Inappropriate Conduct.

Crosland Deposition, Exhibit 1, (Handbook, p. 23).

Harassment or Inappropriate Conduct of any type, whether sexual, ethnic or racial, is not tolerated at Wal-Mart. Wal-Mart is committed to maintaining a work environment that is free of unlawful harassment as well as other inappropriate conduct, regardless of whether the conduct rises to the level of unlawful harassment. We want to provide a work environment where everyone is comfortable.

Any negative or stereotypical comment or action, whether welcome or unwelcome, aimed at an individual's gender, race, religion, physical or mental disability, physical appearance, age, marital status, national origin, color or sexual orientation is inappropriate at Wal-Mart and will not be tolerated.

Associates who engage in any type of harassment or inappropriate conduct on a Wal-Mart property, at Wal-Mart sponsored functions or while traveling on behalf of the Company, whether "on the clock" or not will be subject to disciplinary action up to and including termination.

Associates who are subjected to conduct prohibited under this policy are encouraged to report their concern to any salaried member of management. Prompt action will be taken and no retaliation will occur against the Associate making the report. All allegations of harassment/inappropriate conduct will be investigated…[a]ppropriate action will be taken to eliminate such conduct and to ensure there will be no recurrence of the conduct.



eRBH

Crosland Deposition, Exhibit 1, (Handbook, p. 24).

        In addition to the language cited hereinabove, the handbook contained an acknowledgment section which provided as follows:

> This handbook is intended solely as a general information guide to let Associates know about the current policies and programs Wal-Mart has in place. The policies and benefits presented in this handbook are for your information and do not constitute terms or conditions of employment. This handbook supersedes all prior handbooks. This handbook is not a contract….I understand that the information contained in this handbook are guidelines only, and are in no way to be interpreted as a contract.

Crosland Deposition Exhibit 1, (Handbook, p. 47).

        According to the language of the handbook and the policies of the Defendant, new employees were supposed to read and sign the acknowledgment section of the handbook, and to give the signed acknowledgment to their manager. Winfield McCutcheon testified that he signed the acknowledgment and that the cited language looked to be what he signed off on. W. McCutcheon Deposition, p. 66. Linda McCutcheon testified that she signed a number of papers when she first became employed at Wal-Mart, but that she did not directly remember the language in the acknowledgment, although she "may have" signed this document. L. McCutcheon Deposition, p. 16.

        In Hessenthaler, the South Carolina Supreme Court's most recent enunciation concerning the standard for altering an employee's at-will employment status through publication of an employee handbook, the Court held that courts "should intervene to resolve the handbook issue as a matter of law…if the handbook statements and the disclaimer, taken together, establish beyond any doubt tha[t] an enforceable promise either does or does not exist." Hessenthaler, 616 S.E.2d at 697, quoting Stephen F. Befort, *Employee Handbooks and Illegal Effect of Disclaimers,*



13 Indus.Rel.L.J. 326, 375-376 (1991-1992). The Court specifically noted the importance of having a "conspicuous" disclaimer, such as one appearing in bold type or a prominent position. <u>Hessenthaler</u>, 616 S.E.2d at 697. In the case at bar, Defendant does not dispute that its disclaimer was not "conspicuous" in the sense that it was printed separately or in bold type.[15] However, the fact that the disclaimer in Wal-Mart's employee handbook was not "conspicuous" as that term has been defined by the South Carolina courts does not mean that the handbook constituted a contract as a matter of law, particularly where both Plaintiff's state that they at the very least "may have" signed the disclaimer, with Winfield McCutcheon actually conceding that he signed the acknowledgment stating that the handbook was not a contract. Rather, the Court should look to the entire text in resolving this issue.  <u>Hessenthaler</u>, 616 S.E.2d at 697 [courts should look to whether the "handbook statements and the disclaimer, taken together, establish beyond any doubt tha[t] an enforceable promise either does or does not exist"]; <u>Lingard</u>, 605 S.E.2d at 548 ["[T]he disclaimer is merely one factor to consider in ascertaining whether the handbook as a whole conveys credible promises that should be enforced...[T]he entire handbook, including any disclaimer, should be considered in determining whether the handbook gives rise to a promise, an expectation and a benefit"], citing <u>Flemming v. Borden, Inc.</u>, 450 S.E.2d 589, 596 (S.C. 1994).  After careful consideration of the evidence and arguments submitted in conjunction with the applicable caselaw, the undersigned concludes that Defendant's motion for summary judgment with regard to Winfield

---

[15]The South Carolina Supreme Court noted in <u>Hessenthaler</u> that the South Carolina General Assembly had recently passed legislation requiring disclaimers to be in underlined, capitalized letters, appearing on the first page of the handbook, and signed by the employee.  <u>Hessenthaler</u>, 616 S.E. 2d at 697, n. 5; <u>see</u> S.C.Code Ann. § 41-1-110.  This statute is not, however, applicable in the case at bar, as the Plaintiffs' employment with the Defendant ended on or about April 9, 2004.  This statute only applies to handbooks issued after June 30, 2004. <u>Lingard v. Carolina By-Products</u>, 605 S.E.2d 545, 548 (S.C.Ct.App. 2004).



McCutcheon's contract claims should be granted in part, but also denied in part, while Linda McCutcheon's contact claims should be dismissed, in toto.

First, Plaintiffs' argument that the handbook's language regarding harassment, coaching and employment are set forth in mandatory terms so as to make these policies a binding contract is without merit. The handbook states that it is Wal-Mart's "policy" and "objective[ ]" to provide equal employment opportunity and maintain a workplace free of harassment. The open door and coaching policies also use the terms "may", and contain no promise that the process will be successful or that disciplinary actions are limited to or by this process. In fact, the handbook language specifically states that rude or abusive conduct toward another employee, which is specifically what Winfield McCutcheon was charged with by management, may result in immediate termination notwithstanding the Defendant's "coaching" policy. Crosland Deposition, Exhibit 1, p. 23. There is no commitment for employment for a certain term or duration in this language, and under the applicable caselaw no contract was created by this language. See generally, Hessenthaler, 616 S.E.2d at 698-699 [general policy statement of non-discrimination does not create an expectation that employment is guaranteed for any specific duration or that a particular process must be followed before an employee may be fired]; Lingard, 605 S.E.2d at 549 [progressive disciplinary policies do not create a contract where those policies are couched in permissive rather than mandatory terms]; Wadford v. Hartford Fire Ins. Co., No. 87-2872, 1988 WL 492127 at *4 (D.S.C. 1988) ["A review of the relevant authorities... reveals that a policy or representation must limit the duration of employment or the employer's right to terminate employment in order to alter at-will status." ]; Storms v. Goodyear Tire & Rubber Co., 775 F.Supp. 862, 867 (D.S.C. 1991) [noting that language cited by the employee was "not couched in mandatory terms and [did] not contain

29



language that specifically [limited] the employer's right to demote or terminate [the Plaintiff] without cause"]; Prescott v. Farmers Telephone Co-Op. Inc., 491 S.E.2d 698 (S.C.Ct.App. 1998) ["A contract for permanent employment of indefinite duration, which is unsupported by any other consideration than the respective obligations to perform services and pay wages, is terminable at the will of either party."], rev'd on other grounds, 516 S. E. 2d 923 (S.C. 1999); Horton v. Darby Elec. Co., 599 S.E.2d 456, 461, n. 7 (S.C. 2004) [Use of such words as "may", or reference to policies being guides or as not being requirements, are examples of permissive language]; Ludwick v. This Minute of Carolina, Inc., 337 S.E.2d 213, 216 (S.C. 1985); Davenport v. Island Ford, Lincoln, Mercury, Inc., 465 S.E.2d 737, 739 (S.C.Ct.App. 1995).

However, the undersigned does find that the retaliation language found in the employee handbook is at least sufficient to raise a genuine issue of material fact as to whether the cited policy was mandatory and/or was couched in such a promissory tone as to constitute an enforceable promise to survive summary judgment. This language clearly states that employees who are subjected to conduct prohibited under the Defendant's anti-harassment policy are encouraged to report their concern to any salaried member of management, and that when such conduct is reported "no retaliation will occur against the [employee] making the report." See Lingard, 605 S.E.2d at 548, citing Conner v. City of Forest Acres, 560 S.E.2d 606, 611, n. 4 (S.C. 2002) [noting that such language as "will" and "shall" may make policies in a handbook mandatory for purposes of a contract claim]. As the undersigned has previously found that Winfield McCutcheon has submitted sufficient evidence to raise an issue of fact concerning whether he was being retaliated against when he was terminated, the Defendant is not entitled to summary judgment on his breach

30



of contract claim with respect to the retaliation policy in the handbook.[16]

Plaintiff Linda McCutcheon, however, has failed to set forth any evidence of retaliation against her, even assuming she engaged in protected activity. <u>See</u> <u>generally</u>, <u>L.McCutcheon Deposition</u>, pp. 18-20, 25-26; <u>see</u> <u>also</u> discussion in Section IV, <u>infra</u>. Therefore, even assuming a contract existed between the parties with respect to the retaliation language in the employee handbook, there has been no evidence presented to show a breach of this language with respect to Linda McCutcheon, or to show that Linda McCutcheon was wrongfully terminated by the Defendant in violation of this language. <u>Small</u>, 357 S.E. 2d at 455 [To establish a breach of contract, the employee must show that the employer breached the pertinent provisions or policies at issue]. Therefore, Plaintiff Linda McCutcheon's contract claims should be dismissed.

## IV.

### (Constructive Discharge Claim)

Finally, Plaintiff Linda McCutcheon has also included a state law claim for constructive discharge in her Complaint (third cause of action). Linda McCutcheon alleges that the

---

[16]It is arguable that the language relating to harassment on page 24 of the Defendant's handbook could also be deemed "mandatory" where it states that appropriate action "will" be taken to eliminate such conduct and to ensure there will be no recurrence of the conduct. However, while this language may appear to be no more mandatory than the language cited by the Court in <u>Hessenthaler</u>; <u>see</u> 616 S.E.2d at 698 [quoting the employer's handbook which states that all decisions regarding hiring and promotion "are made" without regard to discriminatory criteria]; even if the Court were to find that there is a question of fact as to whether the language concerning harassment was mandatory, for the reasons discussed in section II(c), <u>supra</u>, the undersigned has already found that Winfield McCutcheon has failed to present sufficient evidence to support a discriminatory harassment claim in this case. Plaintiff Linda McCutcheon's evidence is of a similar nature, and is therefore also not sufficient to support a breach of contract claim based on the anti-harassment policy set forth in the handbook. See <u>L. McCutcheon Deposition</u>, pp. 22-25; <u>Smith</u>, 388 F.3d at 566-567 [mere utterances that engender offensive feelings do not provide an automatic basis to find that an actionable hostile work environment existed]; <u>Cram</u>, 49 F.3d at 474 [Sporadic or casual comments are unlikely to support a hostile environment claim].



Defendant's conduct in failing to enforce the policies and procedures of its handbook together with the "significant harassment and discrimination during her employment" required her to quit her employment because "no reasonable person would have remained employed under those circumstances". See L. McCutcheon Complaint, at ¶¶ 74-82.

Linda McCutcheon does not address the Defendant's motion for summary judgment with regard to her constructive discharge claim in her brief. Defendant asserts in its motion for summary judgment that Linda McCutcheon's claim for constructive discharge is without merit because she has failed to establish any enforceable contract or enforceable terms and conditions of employment arising out of the Defendant's handbook. However, while that may be the correct standard to review the claim set forth in Linda McCutcheon's first cause of action (wrongful termination in violation in violation of contract), that is not the correct standard for evaluating her general state law constructive discharge claim set forth in her third cause of action.   The Fourth Circuit has held "that a [South Carolina state law claim for] constructive discharge occurs '[w]here an employer deliberately makes an employee's working conditions intolerable and thereby forces her to quit her job.'" Goldsmith v. Mayor and City Council of Baltimore, 987 F.2d 1064, 1071-1072 (4th Cir. 1993)(citing Holsey v. Armour & Co., 743 F.2d 199, 209 (4th Cir. 1984)(quoting J.P. Stevens & Co, Inc. v. NLRB, 461 F.2d 490, 494 (4th Cir. 1972)), cert. denied, 470 U.S. 1028 (1985). This is essentially the same standard as a constructive discharge claim under Title VII.[17]

In order to establish a claim for constructive discharge,   Linda McCutcheon must

---

[17]The main difference between these two standards is that a discriminatory purpose is necessary to constitute a constructive discharge under Title VII, while no such discriminatory motive behind the offending conduct is required for a state law constructive discharge claim. See Goldsmith, 987 F.2d at 1071-1072, citing Bristow v. Dailey Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985).



have been subjected to employment practices which made her working conditions intolerable, thus forcing her to quit. <u>Garrett v. Hewlett Packard Co.</u>, 305 F.3d 1210, 1221 (10th Cir. 2002) ["Constructive discharge occurs 'when the employer . . . has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign'....The bar is quite high in such cases: a plaintiff must show he had no other choice but to quit."]; <u>Amaker v. Winn-Dixie, Greenville, Inc.</u>, No. 95-1254, 1995 WL 706873, at \*\*1 (4th Cir. December 1, 1995); <u>EEOC v. Federal Reserve Bank of Richmond</u>, 698 F.2d 633, 672 (4th Cir.), <u>rev'd in part on unrelated grounds</u>, 467 U.S. 867 (1984)(emphasis added); <u>see</u> <u>Vitug v. Multistate Tax Comm'n</u>, 88 F.3d 506, 517-518 (7th Cir. 1996); <u>EEOC v. Clay Printing Co.</u>, 955 F.2d 936, 946 (4th Cir. 1992); <u>Diamond v. T. Rowe Price Associates, Inc.</u>, 852 F.Supp. 372, 397 n. 123 (D.Md. 1994); <u>Drake v. Minnesota Mining & Mfg. Co.</u>, 134 F.3d 878, 886 (7th Cir. 1998). To succeed on this claim, Linda McCutcheon must present evidence to show both deliberateness and intolerability. "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit...." <u>Bristow</u>, 770 F.2d at 1255. As for intolerability,

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign....Rather, intolerability is...assessed by the objective standard to whether a reasonable person in the employee's position would have felt compelled to resign.

<u>Blistein v. St. John's College</u>, 74 F.3d 1459, 1468 (4th Cir. 1996), <u>overruled in part on other grounds</u>, <u>Oubre v. Entergy Operations, Inc.</u>, 522 U.S. 422, 428 (1998).

Plaintiff has failed to present evidence sufficient to meet this standard. She alleges only generally in her Complaint that she was harassed and discriminated against, while her deposition testimony only reflects a general discussion with one or more persons about her marriage, with no evidence to support a finding of "intolerability". <u>L. McCutcheon Deposition</u>, pp. 24-25. The

33



evidence also shows that after her husband was fired, Linda McCutcheon quit rather than continue to work for the Defendant.  No evidence has been presented to show a deliberate effort on the part of the Defendant to get Linda McCutcheon to quit, nor does Linda McCutcheon's version of the events surrounding her resignation, even when assumed to be true for purposes of summary judgment, rise to a level of intolerability sufficient to meet the standard for a constructive discharge claim. See L. McCutcheon Deposition, pp. 17-18.  Witnessing her husband's termination, even under circumstances which Linda McCutcheon felt were unfair, is not a circumstance sufficient to give rise to a constructive discharge claim by her when she then submitted her resignation in protest. See Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994) ["dissatisfaction with work assignments, feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."]; Bristow, 770 F.2d 1255 [employees are not guaranteed a working environment free of stress]; Diamond, 852 F.Supp. at 397 [An employee is not permitted to leave work simply because he or she alleges they are being subjected to adverse conduct in the work place. The standard remedy is to "stay and fight."];  Drake, 134 F.3d at 886 ["more than ordinary discrimination is necessary to establish a constructive discharge claim; in the 'ordinary' case, an employee is expected to remain employed while seeking redress"]; *cf.* Wilkerson v. Springfield Public School Dist. No. 186, No. 01-4289, 2002 WL 1453591 at **2 (7th Cir. July 3, 2002) [plaintiff resigning because he believed he would soon be fired was not a constructive discharge].

Therefore, Linda McCutcheon having failed to present sufficient evidence to create a genuine issue of fact as to whether she was constructively discharged as that term is defined in the applicable caselaw, this claim is subject to dismissal



**Conclusion**

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment with respect to Linda McCutcheon's Complaint (C/A No. 5:04-2467) be **granted**, and that Linda McCutcheon's case be **dismissed**.

It is further recommended that Defendant's motion for summary judgment be **granted** with respect to Winfield McCutcheon's (C/A No. 5:04-2468) first, second and fourth causes of action, and that these claims be **dismissed**. Defendant's motion with respect to Winfield McCutcheon's third cause of action (§ 1981 retaliation claim) should be **denied**. Finally, summary judgment should also be **granted** with respect to Winfield McCutcheon's fifth and sixth causes of action, except to the extent these causes of action allege wrongful termination or breach of contract based on violation of the alleged right not to be retaliated against set forth in the employee handbook. Summary judgment as to that sole claim or allegation should be **denied**.

_____
Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

January _10,  2006

35

